UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                    )
KEITH HOPPS,                        )
                                    )
        Plaintiff,                  )
                                    )
    v.                              )        Civil Action No. 03-01830 (PLF)
                                    )
WASHINGTON METROPOLITAN AREA        )
TRANSIT AUTHORITY,                  )
                                    )
                                    )
        Defendant.                  )
_____)

OPINION

This matter is before the Court on defendant's motion for summary judgment.

Upon consideration of the motion, the opposition, the reply, and the entire record in the case, the

Court will grant defendant's motion and enter judgment for the defendant on Counts One and

Two and dismiss Counts Three and Four for lack of subject matter jurisdiction.[1]

I. BACKGROUND

Plaintiff Keith Hopps, an African American male, is currently employed by

defendant Washington Metropolitan Area Transit Authority ("WMATA").  WMATA is an

agency created by an interstate compact as authorized by Congress through Pub. L. No. 89-774

and is an instrumentality of Maryland, Virginia, and the District of Columbia.  See D.C. Code

_____

[1]      The briefs filed in relation to this motion are Defendant's Motion for Summary Judgment
("Def. Mot."); Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment
("Pl. Resp."); and Defendant's Reply to Plaintiff's Response to Defendant's Motion for
Summary Judgment ("Def. Reply").

§ 1107.01 (2001).  Plaintiff was hired by WMATA in 1984 as a Special Police Officer.  See

Deposition Transcript of Keith Hopps ("Hopps Dep. Tr.") at 12:23-13:1.[2]  Plaintiff was

promoted a number of times over the years until he held the position of Structure Repairer AA.

On September 24, 2002, plaintiff was medically disqualified from his position. Id. at 17:6-18:14.

Thereafter, plaintiff was employed with National Semiconductor from July 2003 until December

2004.  He returned to WMATA as  an employee, on or about January 3, 2005.  See Affidavit of

Roslyn E. Rikard ("Rikard Aff.") ¶ 2.

### A.  Plaintiff's Work-Related Injuries

On January 8, 1998, plaintiff received an electric shock while working on

WMATA's "third rail" in Virginia, suffering injuries to multiple body parts.  See Pl. Ex. 2,

April 2, 2003 Compensation Order ("Compensation Order"), Hopps v. WMATA, OHA

No. 03-057 at 2.  He was admitted to the ICCU at Fort Washington Hospital and remained in the

hospital for five days, until January 13, 1998.  See Keith Hopps Answers to Defendant's

Interrogatories, dated August 5, 2004 ("Hopps Resp. Interrogs.") at 12.  Plaintiff initially

returned to work with duty restrictions prescribed by his physician, but eventually was able to

return to work without any limitations. He was ultimately paid benefits for his injuries pursuant

to a settlement agreement between plaintiff, WMATA and its insurers.  See Compensation Order

at 3.

---

[2]      As a WMATA employee, plaintiff is represented by Local 689 of the
Amalgamated Transit Union, the collective bargaining representative for the majority of
WMATA's workforce.  See Hopps Dep. Tr. at 14:13-18.

On April 7, 2000, while inspecting a Metro tunnel in Maryland, plaintiff tripped, fell, and rolled down a hill.  See Compensation Order at 3.  His body struck several tree trunk stumps as he rolled down, and he again injured multiple body parts.  Plaintiff was paid benefits for his injuries pursuant to the workers' compensation law of Virginia; eventually, he returned to work full-time.  Id.

Two years later, on April 4, 2002, while working at the L'Enfant Plaza subway tunnel site, plaintiff stepped on uneven ground and twisted his right lower extremity.  He was examined by his doctor who imposed light duty restrictions with regard to bending, standing, walking and lifting.  Compensation Order at 4.  Plaintiff tried to return to work the next day but, he alleges, he was told by his supervisors that there was not any light duty work available.  Id. Plaintiff therefore stopped working until June 10, 2002, more than two months later, when his supervisors advised him that there was light duty work available for him.  Id.  A dispute arose between WMATA and plaintiff regarding the benefits he was entitled to in connection with this accident.  Plaintiff eventually filed a claim for worker's compensation benefits pursuant to the District of Columbia Worker's Compensation Act.  Id. at 1.  In his claim, plaintiff sought temporary total disability benefits for his wages lost between April 17, 2002 and June 10, 2002. Id.  He also requested authorization for the surgery recommended by his physician. Id. at 2.  A full evidentiary hearing was held on January 23, 2003 before Administrative Law Judge Amelia G. Govan.  Id. at 1.  Judge Govan ruled in plaintiff's favor on April 2, 2003, granting him the relief he sought. Id. at 8.[3]

---

[3]   Plaintiff asserts that he eventually had to file a motion for default against WMATA because it refused to comply with Judge Govan's order; a copy of the default motion is not in the record.  See Pl. Resp., at 6.

WMATA claims that on September 6, 2002 it received a letter from plaintiff's treating physician, Dr. Richard Meyer, in which the doctor recommended certain specific reasonable accommodations for plaintiff's injuries pending his surgery.  See Def. Mot. at 4.[4] WMATA alleges that in response to Dr. Meyer's letter, it arranged for two independent medical examinations ("IMA") of plaintiff by Dr. Robert Gordon and Dr. Lewis Levitt, and that each doctor concluded that plaintiff could return to work without restrictions.  Id.  Nevertheless, Dr. Johnson of WMATA's medical office "acquiesced" in Dr. Meyer's recommendation and medically disqualified plaintiff pursuant to Section 124 of the collective bargaining agreement. Id.; Johnson Dep. Tr. at 30:1-18.

Section 124 of the WMATA/Local 689 collective bargaining agreement provides for certain procedures when an employee is determined to be physically disqualified from performing the work of his position, including referral for preferential consideration for other WMATA positions.  See Def. Mot., Ex. B to Affidavit of Edwin M. Waleryszak ("Waleryszak Aff.").  WMATA alleges that, pursuant to the terms of the agreement, plaintiff was given the opportunity to apply for a less physically demanding job, but that, as of August 16, 2004 (the date of plaintiff's deposition), he had not applied for a WMATA position in the Section 124 program for "approximately 7 or 8 months."  Def. Mot. at 5.[5]  Plaintiff asserts that he was "sent home" after WMATA received Dr. Meyer's letter. Pl. Resp. at 7.

---

[4]     A copy of the September 6, 2002 letter is not in the record; plaintiff does not appear, however, to dispute the existence or content of the letter.

[5]     The record is unclear as to whether plaintiff applied for WMATA positions between September 6, 2002 and January 2004.

Plaintiff had foot surgery in May 2003 and began working for National Semiconductor in Annapolis Junction, Maryland in July 2003. Id.; Hopps Dep. Tr. at 153:20-23. He subsequently applied and was accepted for a Station Manager position with WMATA and began work on January 3, 2005.  See Rikard Aff. ¶ 2.

### B.  Hostile Work Environment

Plaintiff alleges that during the course of his employment with WMATA he was discriminated against based on his ethnicity and that his workplace became "an unbearably hostile work environment" as a result of this harassment.  See Complaint ¶ 13.  Plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") in which he claimed that he was "discriminated against because of [his] race . . . and [his] disability."  See Def. Ex. 1, Charge of Discrimination, dated January 16, 2003 ("Charge"). Plaintiff listed September 5, 2002 as both the earliest and the latest dates on which "discrimination took place."  Id.  He claims that on that date he was "ordered to see one of the main conspirators in discrimination against him," Carol Robertson in WMATA's Department of Risk.  See Pl. Resp. at 10.  He further alleges that Ms. Robertson  instructed him to "ignore his [d]octor's orders" and to "[t]ake 2 Tylenol's [sic] and come to work."  Id.  In both his complaint and response to WMATA's written discovery requests, however, plaintiff asserts that the alleged discriminatory actions were not limited to September 5, 2002, but occurred throughout the years 2000 to 2002.

Specifically, plaintiff states that:

1. In April 2000, he was told that he was not "moving fast enough" by his supervisor;

    2.  In July 2000, he was ordered to use a Hilti rotary hammer, despite his doctor's recommendation against it;

    3.  In December 2001, he was ordered by his supervisor to drive a work truck even though a co-worker offered to drive the truck;

    4.  He was not allowed to use the WMATA computer room to prepare his reports;

    5.  On March 25 and 26 2002, his supervisors asked him to "hot stick" the third rail so that when he refused, they could take him for a post incident drug test;

    6.  On April 3, 2002, one of plaintiff's supervisors requested that he provide medical documentation substantiating his claim that he should not "hot stick" the third rail.  Thereafter, plaintiff was told by a member of WMATA's RISK department that it was considering disciplinary action for his refusal to hot stick;

    7.  On April 17, 2002, he saw a "post-it" note on one of his supervisor's desks from another supervisor requesting that plaintiff's review be changed from satisfactory to unsatisfactory because of his disability;

    8.  On April 18, 2002, one of plaintiff's supervisors sent him a memo in which he "rejected" plaintiff's doctor's diagnosis and threatened to terminate him;

    9.  On April 19, 2002, plaintiff participated in a meeting with  "people investigating his claims," and these individuals admitted to plaintiff that his supervisors wanted to terminate him and suggested that he look for another job by contacting his union;

    10.  On April 22, 2002, plaintiff, one of his supervisors, and a union representative held a meeting during which the supervisor "lied" and "laughed" about plaintiff's hostile work environment claim;

    11.  Plaintiff's vacation submissions for 2002 and 2003 initially were denied.[6]

See Hopps Resp. Interrogs. at 5-6, 10-11, 14. Plaintiff further stated that his workplace had

become unbearably hostile because:

---

[6]    Plaintiff admits, however, that he received all of his vacation by the end of the summer each year.

1. He was refused light duty work by management;

2. His vacation and sick leave were denied and delayed;[7]

3. He was assigned jobs that were harassing, demeaning, and would cause further injury and loss of income;

4. Jokes about his hostile work environment claims were made during a meeting;

5. False information was given out about his case;

6. WMATA "illegally" requested that he provide medical documentation about his claim;

7. During a meeting, Supervisor William Fuller requested a letter from any employee who did not want to be a "team leader" and stated that such a letter was necessary "because of Hopps";

8. On March 25 and 26, 2002, plaintiff was told to "hot stick" a particular area and was told that if he declined he would be taken for a "post incident drug test" as a "prelude to being written up";

9. On April 3, 2002, plaintiff was told by Njemmara Abba of RISK that disciplinary action was being sought against him because he refused to "hot stick" the rail; and

10. During the April 22, 2002 meeting, Mr. Bunting "lied" and "laughed" at him.

Id. at 6-7.  In addition, plaintiff asserts in his opposition to WMATA's motion that from July 2002 to September 2002, he was "routinely forced . . . to work under the authority of a less senior, less qualified white co-worker" and that said co-worker "treated [him] as a laborer." Pl. Resp. at 8; see Affidavit of Keith Hopps ("Hopps Aff."), ¶ 4 (Aug. 8, 2005).

---

[7]     Plaintiff asserts that when he first took time off because of his disability in 1998, he was given all of his vacation time by his then supervisor, Tony Talley, an African American.  See Pl. Resp. at 10.  In 2002 and 2003, however, he initially was denied his vacation by his supervisor Larry Lee, a white male.  Id.  Plaintiff claims that Mr. Lee incorrectly assumed that he had used up all of his vacation time with sick leave, but once Mr. Lee "ascertained [his] vacation status," he received all of his vacation time each year.  Id.

The parties dispute when plaintiff filed his EEOC Charge. WMATA asserts that the Charge was filed on January 16, 2003, the date that appears on the Charge.  Def. Mot. at 5. Plaintiff counters that he "filed" a charge on September 5, 2002 but that the "actual charge statement was re-issued to [him] for his signature and then dated January 16, 2003. Id.  Pl. Resp. at 7.  The letter sent to plaintiff on December 9, 2002 instructing him to sign and return the charge reflects that he met with an EEOC investigator for an intake interview only on September 15, 2002.  See Pl. Ex. 4, Letter from Samantha Canary, Federal Investigator to Keith Hopps, Dec. 19, 2002.  The charge was prepared based on the information he provided the investigator in that interview.  See id.

The EEOC issued a Dismissal and Notice of Rights on June 12, 2003, finding that "[b]ased upon its investigation, [it] is unable to conclude that the information obtained establishes violations of the statutes."  See Def. Ex. 2, EEOC Dismissal and Notice of Rights, June 12, 2003.  Plaintiff filed his action with this Court on September 2, 2003.  The Complaint contains four counts:  (1) Discrimination in the Course of Employment in Violation of the Civil Rights Act (hostile work environment claim) (Count One); (2) Wrongful Termination in Violation of the Civil Rights Act (Count Two); (3) Intentional Infliction of Emotional Distress (Count Three); and (4) Discrimination and Wrongful Termination on Account of Disability in Violation of the Americans with Disabilities Act (Count Four).

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits [or declarations], if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." FED. R. CIV. P. 56(c); see also Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 247-48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006).  "A fact

is 'material' if a dispute over it might affect the outcome of a suit under the governing law;

factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment

determination."  Holcomb v. Powell, 433 F.3d at 895 (quoting Anderson v. Liberty Lobby, Inc.,

477 U.S. at 248).  An issue is "genuine" if the evidence is such that a reasonable jury could

return a verdict for the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248;

Holcomb v. Powell, 433 F.3d at 895.  When a motion for summary judgment is under

consideration, "the evidence of the non-movant is to be believed, and all justifiable inferences

are to be drawn in [his] favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. at 255; see also

Mastro v. Potomac Elec. Power Co., 447 F.3d 843, 849-50 (D.C. Cir. 2006); Aka v. Washington

Hosp. Center, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc); Washington Post Co. v. Dep't of

Health and Human Servs., 865 F.2d 320, 325 (D.C. Cir. 1989).

        The non-moving party's opposition, however, must consist of more than mere

unsupported allegations or denials and must be supported by affidavits, declarations or other

competent evidence, setting forth specific facts showing that there is a genuine issue for trial.

FED. R. CIV. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  The non-movant is

required to provide evidence that would permit a reasonable jury to find in his favor. Laningham

v. U.S. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  If the non-movant's evidence is "merely

colorable" or "not significantly probative," summary judgment may be granted. Anderson v.

Liberty Lobby, Inc., 477 U.S. at 249-50.  To defeat a motion for summary judgment, a plaintiff

must have more than "a scintilla of evidence to support [his] claims."  Freedman v. MCI

Telecomm. Corp., 255 F.3d 840, 845 (D.C. Cir. 2001).  In an employment discrimination case,

"[u]sually, proffering evidence from which a jury could find that the employer's stated reasons

were pretextual will be enough to get a plaintiff's claim to a jury."  George v. Leavitt, 407 F.3d

405, 413 (D.C. Cir. 2006) (citing Carpenter v. Fed. Nat'l Mortgage Ass'n, 165 F.3d 69, 72 (D.C.

Cir. 1999) (internal quotations omitted).

## III.   DISCUSSION

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment

practice for an employer . . . to discriminate against any individual with respect to his

compensation, terms, conditions, or privileges of employment, because of such individual's race,

color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Plaintiff asserts that

WMATA violated Title VII by:  (1) requiring him to work in a discriminatorily hostile work

environment, and (2) wrongfully terminating him from his position.

### A.  Hostile Work Environment Claim

#### 1.  Exhaustion of Administrative Remedies

Before suing under Title VII, an aggrieved party must first exhaust his

administrative remedies by filing a charge of discrimination with the EEOC within 180 days of

the alleged discriminatory incident.  42 U.S.C. § 2000e-5(e)(1) and § 2000e-5(f)(1); see

Washington v. WMATA, 160 F.3d 750, 752 (D.C. Cir. 1998), cert. denied, 527 U.S. 1038

(1999).  Although it is not a jurisdictional requirement, failure to timely file a charge within the

prescribed period constitutes a failure to exhaust administrative remedies and is grounds for

dismissal, subject in some cases to equitable tolling.  See id. at 752-53; Koch v. Donaldson, 260

F. Supp. 2d 86, 89 (D.D.C. 2003), *aff'd* 2004 WL 758957 (D.C. Cir. April 7, 2004).  A court's power to equitably toll filing periods may be exercised "only in extraordinary and carefully circumscribed instances."  Koch v. Donaldson, 260 F. Supp. 2d at 90 (quoting Mondy v. Sec'y of the Army, 845 F.2d 1051, 1057 (D.C. Cir. 1988)).

WMATA asserts that plaintiff's hostile work environment claim is time-barred because he failed to file a charge of discrimination with the EEOC within 180 days of any allegedly discriminatory incident.  Def. Reply at 2.  In response, plaintiff admits that he "formally" filed a charge with the EEOC on January 16, 2003, but asserts that he initially contacted an EEOC counselor for an intake interview on or about September 5, 2002.  He argues that the Court should calculate the 180-day period from that date.  Pl. Resp. at 9.[8]  Plaintiff's argument is without merit.  The critical sentence of Title VII's charge filing provision is:  "A *charge* under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e)(1) (emphasis added).  Courts have uniformly held that the procedural requirements of Title VII must be strictly applied.  See Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 108 (2002) (citing Mohasco Corp. v. Silver, 447 U.S. 807, 826 (1980) (holding that "strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law"));  Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 398 (1982) (holding that "the particular

---

[8]     In support of his assertion that he met with an EEOC counselor on September 5, 2002, plaintiff cites a letter he received from Samanthia Canary, a Federal Investigator with the EEOC Washington Field Office.  See Pl. Ex. 4. In the letter, Ms. Canary states that she is enclosing a "charge of discrimination that was prepared from the intake interview that was conducted on September 15, 2002."  Id.  Plaintiff asserts that Ms. Canary made an error when she wrote "September 15, 2002" and really meant "September 5, 2002."

purpose of the filing requirement" is "to give prompt notice to the employer").  Accordingly, the

operative date on which plaintiff filed his EEOC charge is January 16, 2003.

WMATA claims that the only employment action that occurred within the 180

days prior to January 16, 2003 (*i.e.*, on or before July 20, 2002) is the September 24, 2002

medical disqualification of plaintiff under Section 124 of the collective bargaining agreement.

See Def. Mot. at 9.  WMATA argues that because this action was taken at plaintiff's request, it

cannot be the basis for a hostile work environment claim.  Id.  Plaintiff counters that an ongoing

program of discrimination exists at WMATA.  Pl. Resp. at 10-11.  Because  hostile work

environment claims are composed of a series of separate acts that collectively constitute one

unlawful employment practice, plaintiff claims that it does not matter that some of the

component acts or incidents fall outside the 180-day time period, so long as at least one act

contributing to the claim did occur within the 180-day time period.  See Nat'l R.R. Passenger

Corp. v. Morgan, 536 U.S. at 118  He asserts that at least two acts occurred within the required

time period:  (1) he was forced to work under the authority of a less senior, less qualified white

co-worker who treated plaintiff like "a laborer" from July to September 2002; and (2) he was

wrongfully denied his vacation during the summers of 2002 and 2003.  See Pl. Resp. at 8.

In Morgan, the Supreme Court held that a hostile work environment claim, unlike

other discrimination claims, may be actionable even though it is based, in part, on acts that

occurred outside the appropriate time period.  The Supreme Court noted that while most

discriminatory acts are "discrete acts" -- that is, "[e]ach incident of discrimination and each

retaliatory adverse employment decision constitutes a separate actionable 'unlawful employment

practice[,]'"

12

> [h]ostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. The "unlawful employment practice" therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.

Nat'l R.R. Corp. v. Morgan, 536 U.S. at 114. Thus, because "[a] hostile work environment claim is comprised of a series of separate acts that collectively constitute one 'unlawful employment practice[,]'" id. at 117, plaintiff's claim of hostile work environment is not time-barred if some of the alleged acts fall outside of the limitations period "so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." Id. at 122.

Here, plaintiff is not alleging a series of discrete acts -- for example, termination, failure to promote, denial of transfer, or refusal to hire. Rather, he alleges that a pattern of continuing violations occurred that collectively constitute one "unlawful employment practice" which he characterizes as a hostile work environment based on race. He maintains that his supervisors harassed him on a day-to-day basis, and that the cumulative effect of this harassment created a hostile work environment. Therefore, because plaintiff filed his Charge within 180 days of at least two of the acts that contributed to the alleged hostile work environment (*i.e.* being forced to work under a less senior co-worker and having his vacation wrongfully denied), all of the alleged acts pertaining to the claim may be considered by the Court, even those that fall outside the 180-day time period. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. at 117-18. Having established that it has jurisdiction over plaintiff's hostile work environment claim, the Court must examine whether plaintiff has pled facts sufficient to establish a *prima facie* case for the claim.

2.  *Prima Facie* Case

Plaintiff alleges that he was subject to race-based discrimination by his supervisors at WMATA, and that the discrimination rendered his workplace "unbearably hostile." See Complaint ¶ 13.  "Under Title VII it is an unlawful employment practice to 'requir[e] people to work in a discriminatorily hostile or abusive environment.'"  Singletary v. District of Columbia, 351 F.3d 519, 526 (D.C. Cir. 2003) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).  Title VII is violated "[w]hen the workplace was so permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Harris v. Forklift Sys., Inc., 510 U.S. at 21 (quoting Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65-67 (1986)); see also George v. Leavitt, 407 F.3d at 416-17 .

The D.C. Circuit has adopted the Sixth Circuit's five-part test for making out a *prima facie* Title VII hostile environment claim, under which a plaintiff must show:

> (1) the employee was a member of a protected class; (2) the employee was subjected to unwelcome [] harassment; (3) the harassment complained of was based upon [plaintiff's membership in the protected class]; (4) the charged [] harassment had the effect of unreasonably interfering with the plaintiff's work performance and creating an intimidating, hostile, or offensive working environment; and (5) the existence of respondeat superior liability.

Davis v. Coastal Int'l Security, Inc., 275 F.3d 1119, 1122-23 (D.C. Cir. 2002) (quoting Yeary v. Goodwill Industries-Knoxville, Inc., 107 F.3d 443, 445 (6th Cir. 1997)). In determining whether conduct is sufficiently severe or pervasive to be actionable, the Court must "look to 'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

14

interferes with an employee's work performance.'"   National R.R. Passenger Corp. v. Morgan,

536 U.S. at 116 (quoting Harris v. Forklift Systems, Inc., 510 U.S. at 23); see also Faragher v.

City of Boca Raton, 524 U.S. 775, 788 (1998) (the standards for judging hostility are sufficiently

demanding to ensure that Title VII does not become a "general civility code" and filters out

complaints attacking the "ordinary tribulations of the workplace such as sporadic use of abusive

language, gender-related jokes, and occasional teasing").

       The first element of plaintiff's *prima facie* case is satisfied -- he is a member of a

protected class because he is an African American.  See George v. Leavitt, 407 F.3d at 412.  The

Court also finds that the record contains sufficient evidence from which a reasonable jury could

conclude that plaintiff has been subjected to unwelcome harassment.  From the evidence

presented in this case, a jury might find that plaintiff's supervisors doubt the nature and extent of

his alleged injuries and have made plaintiff's work environment unpleasant because of it.

Plaintiff alleges that his supervisors repeatedly refused to accommodate his need

for light duty work, tried to force him to do jobs that would have caused him further injury, and

even mocked and threatened to terminate him for failing to do his job.  WMATA has failed to

honor  its obligations to plaintiff under the Worker's Compensation statutes.

       The Court finds, however, that plaintiff has failed to establish the third element of

the *prima facie* case required for a hostile work environment claim.  The record is devoid of any

evidence that the harassment plaintiff allegedly endured was racially motivated.  While plaintiff

alleges in his Complaint that the harassment was based on his ethnicity, the complaint does not

contain any factual allegations supporting this assertion.  Furthermore, in his response to

WMATA's written discovery in which plaintiff was asked to "[d]escribe in detail the basis" for

his hostile work environment claim, plaintiff failed to present any evidence that the harassment

was racially motivated.  See Hopps Resp. Interrogs. at 5-6.  His response focuses almost entirely

on the fact that his supervisors have refused to accommodate his *physical* injuries.[9]

Similarly, in his affidavit provided in opposition to defendant's summary

judgment motion, plaintiff does not state that the harassment was racially based.  Indeed, he

refers to the discrimination as "my discrimination by disability," and he states that his

supervisors discriminated against him because "he accepted light duty" work.  See Pl. Ex. 1,

Hopps Aff. ¶¶ 4, 9.  Moreover, plaintiff readily admits in his Response to the present motion that

at least some of his supervisors' behavior was not racially motivated.  Pl. Resp. at 10-11.  For

instance, he acknowledges that the reason his supervisor initially denied his vacation requests in

2002 and 2003 is because the supervisor assumed, albeit incorrectly, that plaintiff had used all of

his vacation time for sick leave.  Once the supervisor learned of the error, he granted plaintiff's

requests.  Plaintiff's failure to present any evidence that the harassment he allegedly endured at

the hands of his supervisors was racially-based is fatal to the viability of his hostile work

---

[9]       In his response to Interrogatory No. 2, in which plaintiff is asked to "describe in detail"
the basis for his hostile work environment claim, plaintiff focuses solely on his alleged disability
and his supervisors' response to it.  See Hopps Resp. Interrogs. at 5-6.  He does not allege any
incidents of race-based discrimination.  Id.  In his response to Interrogatory No. 1, in which he is
asked to "describe in detail" the basis for his allegation that he was subject to race-based
discrimination, plaintiff states "[p]ersons of comparable skill and job titles in the employment of
[WMATA] who have lighter complections are treated more favorably than [plaintiff was] with
regard to assignment duties and continuation of employment." Id. at 6.  The specific incidents
he references thereafter, however, are substantially identical to those listed in response to
Interrogatory No. 2 -- *i.e.*, relating to his alleged disability and his supervisors' response to it.
Plaintiff's self-serving, unsupported statement is insufficient to raise a genuine issue of material
fact to defeat WMATA's motion for summary judgment.  See Hastie v. Henderson, 121
F.Supp.2d 72, 81 (D.D.C. 2000) (no genuine issue of material fact where sole evidence plaintiff
provided was her "own self-serving and conclusory statement"), *aff'd*, 2001 WL 793715 (D.C.
Cir. June 28, 2001).

environment claim.  See Celotex Corp. v. Catrett, 477 U.S. at 324 (the non-moving party's

opposition must consist of more than mere unsupported allegations or denials and must be

supported by affidavits, declarations or other competent evidence, setting forth specific facts

showing that there is a genuine issue for trial).  Accordingly, judgment is entered for the

defendant on Count One of the Complaint.

### B. Wrongful Termination Claim

Plaintiff also asserts that he was wrongfully terminated from his position because

of his ethnicity in violation of Title VII.  See Complaint ¶ 16.  Plaintiff does not clarify what he

means by "ethnicity," which is a term not mentioned in Title VII.  Because he does not raise the

issue of national origin throughout the filings, the Court assumes that in this case this term refers

to plaintiff's race.  WMATA counters that plaintiff's wrongful termination claim must be

dismissed as a matter of law because he cannot state a prima facie case for discrimination.  See

Def. Mot. 13.[10]  Specifically, WMATA argues that plaintiff cannot establish that his termination

supports the required inference of discrimination.  WMATA points out that the decision to

medically disqualify plaintiff was done at his own request and was based on his own doctor's

assessment; it therefore cannot possibly give rise to an inference of discrimination.

Plaintiff does not respond to WMATA's argument with any record evidence,

essentially conceding the point.  The Court notes that Section 124 of the WMATA/Local 689

collective bargaining agreement provides procedures for employees who become physically

disqualified from their position to obtain an alternative position with WMATA.  See Waleryszak

---

[10]     WMATA does not dispute the timeliness of plaintiff's wrongful termination claim.

Aff. ¶ 4. WMATA asserts, without citing to the record for support, that plaintiff "had not applied for a WMATA job in the § 124 program for approximately 7 or 8 months." See Def. Mot. at 5. Again, plaintiff does not counter this assertion.  In response to WMATA's written discovery, plaintiff admits that he "technically [was] not terminated and is subject to recall." See Hopps Interrog. Resp. No. 1.  He argues, however, that his "status is equivalent to termination because he has not been called back to work, nor is there any realistic prospect that he will be." Id.  The record reflects that since submitting his written response to WMATA's interrogatories, plaintiff applied for and was accepted for a Station Manager position with WMATA. Id.  He then returned to work on or about January 3, 2005. Id.  Accordingly, the Court finds that defendant is entitled to judgment on plaintiff's wrongful termination claim.

### C.  Sovereign Immunity

In signing the WMATA Compact, Maryland, Virginia, and the District of Columbia conferred upon WMATA their respective sovereign immunities. Beebe v. WMATA, 129 F.3d 1283, 1287 (D.C. Cir. 1997) (citing Morris v. WMATA, 781 F.2d 218, 219 (D.C. Cir. 1986)). Section 80 of the Compact waives this immunity for torts "committed in the conduct of any proprietary function," while retaining immunity for torts committed by its agents "in the performance of a governmental function." Beebe v. WMATA, 129 F.3d at 1287 (quoting D.C.Code Ann. § 1-2431(80)).  To distinguish governmental from proprietary functions, a court must determine whether the activity amounts to a "quintessential" governmental function, such as law enforcement. Burkhart v. WMATA, 112 F.3d 1207, 1216 (D.C. Cir. 1997).  If it does, the activity falls within the scope of WMATA's immunity. Id. (citing Dant v. District of Columbia, 829 F.2d 69, 74 (D.C. Cir. 1987)).  For those activities that are not "quintessential"

18

governmental functions, immunity will depend on whether the activity is "discretionary" or "ministerial." Burkhart v. WMATA, 112 F.3d at 1216. Discretionary functions are those that involve choice or judgment, and are "based on considerations of public policy." United States v. Gaubert, 499 U.S. 315, 322 (1991). Only discretionary functions are shielded by immunity. Id.

The WMATA Compact confers upon WMATA broad authority regarding its personnel practices. Burkhart v. WMATA, 112 F.3d at 1217. Its choices in hiring, training and supervising its employees "require consideration of numerous factors, including budgetary constraints, public perception, economic conditions, 'individual backgrounds, office diversity, experience and employer intuition.'" Id. (quoting Tonelli v. United States, 60 F.3d 492, 496 (8th Cir. 1995)). Similarly, employee supervision involves "a complex balancing of budgetary considerations, employee privacy rights, and the need to ensure public safety." Id. "The hiring, training and supervising of WMATA employees are governmental functions," and thus are immune from judicial review. Id.; see also Jones v. WMATA, 205 F.3d 428, 432 (D.C. Cir. 2000); Barbour v. WMATA, Civil Action No. 00-344 (Hogan, J.) (D.D.C. May 24, 2002).

1. Intentional Infliction of Emotional Distress Claim

WMATA argues that its immunity bars plaintiff's claim for intentional infliction of emotional distress because the claim is based entirely on the discretionary activities of his supervisors. Plaintiff counters that his claim is not based "on policy per se," but, rather, it is based on individual "acts of discrimination by WMATA agents" who failed "to act within the scope of their administrative responsibilities and follow the basic tenets of Title VII and the ADA." See Pl. Resp. at 16-17. Plaintiff argues that the supervisors' actions therefore were ministerial rather than discretionary.

Plaintiff's argument is without merit.  Each of the actions plaintiff complains of --
that his vacation was temporarily denied in 2002 and 2003, that a supervisor suggested that his
annual review should be changed to "unsatisfactory" because of his disability, that he was asked
to "hot stick" the third rail, that he was forced to use a rotary hammer drill, that a supervisor
sought disciplinary action against him because of his disability, that he was forced to work under
a less senior co-worker, that he was denied sick leave -- are all supervisory in nature, and
therefore, discretionary activities.

In Beebe v. WMATA, the D.C. Circuit affirmed the dismissal of an intentional
infliction of emotional distress claim based on WMATA's immunity.  The plaintiff in Beebe was
a WMATA employee who challenged criticism he received from his supervisors, the abolition of
his job, his non-selection for a newly created position, and his placement in another job.  Beebe
v. WMATA, 129 F.3d at 1286.  The D.C. Circuit held that all of the actions challenged by the
plaintiff involved a "large measure of choice" by his supervisors and therefore fell within the
discretionary function exception.  Id. at 1288 (there was no distinction between the discretion
used by the Beebe's supervisors and the hiring, training and supervision of the bus operators at
issue in Burkhart v. WMATA, 112 F.3d 1207 (D.C. Cir. 1997)).  In the present case, the actions
of which plaintiff complains all involved an exercise of judgment by his supervisors.  As such,
WMATA's immunity extends to  plaintiff's emotional distress claim.  Id.; see also Beebe v.
WMATA, 129 F.3d at 1288; Gray v. Bell, 712 F.2d 490, 508 (D.C. Cir. 1983) (barring
intentional tort claim because conduct fell within discretionary function exception).  Plaintiff's

claim for intentional infliction of emotional distress therefore must be dismissed as a matter of law.[11]

## 2.  ADA Claim

WMATA argues that its immunity also bars plaintiff's claim for damages under the Americans with Disabilities Act.[12]  In support of its argument, WMATA relies on Board of Trustees of the Univ. of Alabama v. Garrett, 531 U.S. 356 (2001), in which the Supreme Court held that because of the Fourteenth Amendment, private individuals are not authorized to recover money damages under the ADA from a state through suit in federal court.  See id. at 374.  The Supreme Court subsequently held that Congress had likewise exceeded its authority to abrogate the states' Eleventh Amendment immunity from ADEA liability in Kimel v. Florida Board of Regents, 528 U.S. 62 (2000).  The District of Columbia Circuit applied the holding in Kimel when it held that WMATA was similarly immune from ADEA liability.  See Jones v. WMATA, 205 F.3d 428, 432 (D.C. Cir. 2000).

In the instant case, plaintiff seeks money damages under the ADA through a suit in federal court from an entity that enjoys sovereign immunity conferred on it by its signatories. Although the ADA purports to abrogate a state's sovereign immunity, the Supreme Court in Garrett held that Congress failed to do so.  Because WMATA is immune from suit, plaintiff's

---

[11]     Having determined that WMATA is immune from plaintiff's intentional infliction of emotional distress claim, the Court need not address WMATA's argument that the claim should be dismissed because plaintiff failed to exhaust his grievance procedure remedies under WMATA's collective bargaining agreement with plaintiff's union. Nor does the Court need to address the merits of the claim.

[12]     Plaintiff did not respond to this argument.

ADA claim must be dismissed.  See Jones v. WMATA, 205 F.3d at 432 (because Congress

exceeded its authority under Section 5 of the Fourteenth Amendment when it attempted to

abrogate the states' Eleventh Amendment immunity under the ADEA, an award of

compensatory and liquidated damages against WMATA was vacated); see also, Barbour v.

WMATA, Civil Action No. 00-344, Slip Op. at 5 (D.D.C. May 24, 2002) (holding that WMATA

is immune from suit for ADA claims).[13]


## IV.  CONCLUSION

Based on the foregoing analysis, the Court grants defendant's motion for summary

judgment on Counts One and Two and dismisses Counts Three and Four for lack of subject

matter jurisdiction.  An Order consistent with this Opinion will issue this same day.


/s/_____
PAUL L. FRIEDMAN
United States District Judge


DATE:  March 30, 2007

_____

[13]     In view of the disposition of this case, it is not necessary for the Court to address whether
the claims are barred by the exclusivity provisions of the District of Columbia's, Virginia's and
Maryland's Workers' Compensation Statutes. In addition, the question of whether WMATA is
immune from claims for punitive damages is moot.

22